**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE AT MEMPHIS**

| | |
|---|---|
| REGIONS BANK, </br>as Indenture Trustee, </br></br>    Plaintiff, </br></br>v. </br></br>CME-CORNERS, INC., and </br>THE HEALTH, EDUCATIONAL AND </br>HOUSING FACILITY BOARD OF THE </br>COUNTY OF SHELBY, TENNESSEE, </br></br>    Defendants. | ) </br>) </br>) </br>) </br>) </br>) Case No. 06-cv-2239-JPM </br>) </br>) </br>) </br>) </br>) </br>) </br>) |

---

**ORDER ESTABLISHING PROCEDURES TO SELL THE COLLATERAL**
**AND SETTING HEARING TO CONFIRM SALE OF THE COLLATERAL**

---

This matter came before the Court on the Expedited Motion of Receiver for Approval of Procedures to Sell the Collateral and to Set Hearings (the "Sale Procedures Motion") filed by Cumberland & Ohio Co. of Texas and its President, James A. ("Buddy") Skinner, together as receiver (the "Receiver"). This Court, having reviewed the pleadings, including that certain Memorandum in Support of Sale Procedures Motion (the "Memorandum"), the evidence in the record, including the Affidavit of James Skinner, and being fully advised on the premises, finds as follows:

1.  Unless otherwise indicated herein, all capitalized terms in this Order have the same meaning ascribed to them in the Memorandum (defined below).

2.  Regions Bank as indenture trustee (the "Trustee") is organized under the laws of Alabama with its designated corporate trust office located in Little Rock, Arkansas.  Trustee, in its capacity as indenture trustee, is the holder of a first deed of trust lien against certain Collateral (as defined in the Receiver Order), which includes without limitation that low-income housing

facility known as The Corners Apartments, located at 4150 Winchester Road, Memphis, Tennessee (the "Project"), and the revenues generated thereby under that certain Lease Agreement (as defined in the Receiver Order).  Trustee holds these liens against the Collateral to secure the repayment of amounts owed to Trustee and certain bondholders pursuant to that certain Trust Indenture (as defined in the Receiver Order) and that certain Deed of Trust (as defined in the Receiver Order), each among The Health, Educational and Housing Facility Board of the County of Shelby, Tennessee (the "Issuer"), CME-Corners, Inc. ("CME-Corners"), and Trustee.

3.	On May 4, 2006, this Court entered its Order Appointing Receiver, Granting Injunctive Relief, and Setting Bond, which was amended and restated, on May 9, 2006, by that certain Amended Order Appointing Receiver, Granting Injunctive Relief, and Setting Bond (the "Receiver Order"), pursuant to which, this Court appointed Cumberland & Ohio Co. of Texas (and its President James A. ("Buddy") Skinner) as Receiver to take possession and control of the Collateral.

4.	Pursuant to paragraphs D(8) and D(30) of the Receiver Order,[1] and as indicated on the record by Receiver's Notice of Engagement of Real Estate Agent Pursuant to Order Appointing Receiver, Granting Injunctive Relief, and Setting Bond, the Receiver entered into that certain Exclusive Listing Agreement, dated June 7, 2006 (the "Listing Agreement"),

---

[1] Paragraph D of the Receiver Order provides, in relevant part:

> The Receiver is hereby appointed to take charge of and to manage, operate, and protect the Collateral, and is hereby given the powers and authority usually held by receivers and reasonably necessary to accomplish the purpose of this receivership, including the powers to:
>
> (8)  enter into all contract necessary to continue, operate, maintain, and preserve the Collateral;
>
> (30)  generally do, execute, and perform any other act, deed, matter or thing whatsoever that the Receiver reasonably deems ought to be done, executed, and performed in and about or with respect to the Collateral or its revenues.

whereby the Receiver retained CB Richard Ellis Memphis Multifamily, LLC ("CBRE") as exclusive real estate broker for the sale of the Collateral. The terms and conditions of the Listing Agreement are consistent with the provisions of the Receiver Order and execution of the Listing Agreement was a prudent action by the Receiver that was required in order to protect the value of the Collateral.

5. Since execution of the Listing Agreement, the Receiver and CBRE have engaged in extensive marketing of the Collateral, which marketing is adequate and sufficient in light of the circumstances of this case.

6. In addition, the Receiver and CBRE have developed a form of contract for sale of the Collateral (the "Stalking Horse Agreement") that is acceptable to the Trustee,[2] with respect to the terms and conditions of a sale of the Collateral, subject to approval of this Court and 28 U.S.C. §§ 2001-04. The Receiver has not yet executed an agreement to sell the Collateral, on the terms set forth in this paragraph or otherwise. A true and correct copy of the Stalking Horse Agreement is attached to the Memorandum as Exhibit B.

7. Pursuant to paragraphs D(27) and U of the Receiver Order,[3] the Receiver has the authority to Conduct a Receiver Sale (as defined in the Receiver Order) with respect to any or all

---

[2] The Trustee has advised the Receiver that it consents to the actions being taken under the Sale Procedures Motion, but that its consent to the Procedures and the ultimate sale of the Collateral remains subject to the terms of the Indenture which provide that bondholders may, under certain circumstances, direct the Trustee to object or seek modification of the relief sought by the Receiver related to a sale of the Collateral.

[3] Paragraph D(27) of the Receiver Order provides, in relevant part:

> The Receiver is hereby … given the powers … to:
>
> (27) at the direction of Trustee and upon further Court Order, market and sell all or any part of the Collateral, pursuant to 28 U.S.C. §§2001, et seq., and in accordance with such terms and conditions as are hereafter approved by Trustee and this Court.

Paragraph U of the Receiver Order provides, in relevant part:

> In the alternative [to a foreclosure or other sale],Trustee may decide, in its sole discretion, to direct the Receiver to sell any or all of the Collateral pursuant to 28 U.S.C. §§2001 et seq. (a

of the Collateral, but is required to obtain this Court's approval and comply with 28 U.S.C. §§ 2001 et seq. The Stalking Horse Agreement will be subject to higher and better offers received by the Receiver at the Receiver Sale in accordance with the terms of this Sale Procedures Order.

8.      In light of the negative cash flow of the Collateral, a Receiver Sale is in the best interests of the receivership estate and the creditors. The Receiver Sale is supported by sound business justifications and its reasonably prudent under the circumstances. The Receiver Sale is necessary at this time and will result in greater distribution to creditors than any other course of action available to the Receiver.

9.      Good cause exists for such Receiver Sale and approval of the Stalking Horse Agreement, which contains reasonable terms and conditions and will likely provide a reasonable return from such a Receiver Sale. The Receiver and the Trustee have acted in good faith with respect to such Stalking Horse Agreement and the Sale Procedures.

10.     Proper and sufficient notice of the Sale Procedures Motion was given. The requirements of Rule LR 7.2 of the Local Rules of the United States District Court for the Western District of Tennessee have been satisfied with respect to the Sale Procedures Motion and the Memorandum.

IT IS, THEREFORE, ORDERED that the Sale Procedures Motion is granted and the Receiver is hereby authorized to enter into the Stalking Horse Agreement with a party of the Receiver's choosing (the "Stalking Horse Bidder"), on the terms and conditions of this Sale Procedures Order and substantially on the terms and conditions of the Stalking Horse Agreement.

---

"Receiver Sale"). In the event Trustee decides to have the Receiver conduct a Receiver Sale, Trustee and the Receiver shall comply with 28 U.S.C. §§2001, 2002, and 2004.

IT IS FURTHER ORDERED that the Receiver shall sell the Collateral at public sale (the "Auction") in accordance with the following procedures:

  A. Except as otherwise expressly stated in the Stalking Horse Agreement, or any applicable executed Purchase Agreement, the sale of the Collateral shall be free and clear of all liens, claims, charges, encumbrances, mortgages, pledges, security interests, and other interests (the "Encumbrances") with any such Encumbrances attaching to the respective Auction proceeds in the same order of priority as they had on the Collateral. Moreover, except with respect to the Assumed Liabilities and Assumed Contracts expressly assumed under the Stalking Horse Agreement or any applicable executed Purchase Agreement, the Successful Bidder (defined below) shall not be obligated to pay or assume any of the Seller's obligations or liabilities, nor shall the Successful Bidder be deemed to have any successor liability for any of Seller's obligations or liabilities.

  B. The Auction shall occur at the offices of CBRE, located at 5855 Ridge Bend Road, Memphis, Tennessee 38120, or at such other place as the Receiver deems appropriate and gives notice of, and at such time and on such date as the Receiver deems appropriate, but not before thirty (30) days after selection of the Stalking Horse Bidder and execution of the Stalking Horse Agreement. The Receiver may adjourn the Auction, the Initial Overbid Deadline (defined below), and/or the Initial Discovery Deadline (defined below) from time to time by announcement at the time and place appointed for the Auction, without further notice or order of the Court. Upon re-commencing any such auction, the Receiver shall give notice of the recommencement of such auction to all parties who have provided the Receiver with name and address where such notice must be sent. Except as otherwise provided in the Stalking Horse Agreement or any applicable executed Purchase Agreement, any sale resulting from the Auction shall be "as is" and "where is," with no express or implied representations and

warranties. Notwithstanding anything to the contrary in the Stalking Horse Agreement or any applicable executed Purchase Agreement, the "Closing" of the sale, as that term is defined in the Stalking Horse Agreement and/or any applicable executed Purchase Agreement, shall not occur prior to the confirmation of the sale, as described in paragraphs N and O below.

    C.  At least thirty (30) days prior to the first scheduled date and time of the Auction, the Receiver (i) shall mail notice of the date, time, place, and terms of the Auction and Confirmation Hearing (as defined in paragraph N below) to all parties in this action, any party which has filed a notice of appearance in this case, as well as all other parties on the attached Certificate of Service, and (ii) may mail such notice to any other parties the Receiver deems appropriate, including any creditors, or potential buyers identified by either the Receiver, CBRE or Trustee. The notice shall be deemed sufficient if sent to the last known mailing address of the addressee _via_ United States first-class mail, postage prepaid. The Receiver may also provide notice by such other means, including facsimile transmission, as are reasonably calculated to reach the addressee.

    D.  In addition, the Receiver shall cause notice of the Auction to be published once a week for at least four (4) weeks prior to the first-scheduled date and time of the Auction in a newspaper of general circulation in Shelby County, Tennessee and Davidson County, Tennessee. The form of the notice shall be sufficient if it contains the time, date, place, and basic terms of the Auction, as well as a description of the Project by common street address. The Receiver may include such additional information in the notice as it deems appropriate.

    E.  Any party interested in bidding ("Potential Bidder") on the Collateral may attempt to qualify as a "Qualified Bidder" (as defined below). Only "Qualified Bidders" will be permitted to bid.

    F.  Information regarding the Collateral and its operations, assets, and

financial condition will be provided and/or made available to Potential Bidders as provided below.  Upon a request for such information made to CBRE, CBRE shall provide each Potential Bidder with a copy of a Confidentiality Agreement in a form acceptable to the Receiver (the "Confidentiality Agreement").

        G.    Upon receipt by the Receiver of (1) an executed Confidentiality Agreement and (2) evidence satisfactory to the Receiver and to Trustee that the Potential Bidder is reasonably likely to be able to consummate a purchase of the Collateral, a Potential Bidder shall be provided with a copy of the Stalking Horse Agreement, and shall be afforded the opportunity, upon reasonable notice to the Receiver or CBRE, to inspect the Project and have access to whatever financial data the Receiver provided to the Stalking Horse Bidder; provided, however, all physical and on-site inspections of the Project must be concluded before seven (7) days prior to the first scheduled date and time of the Auction.

        H.    The Stalking Horse Bidder referenced in this Sale Procedures Order shall be treated as an "Actual Bidder" (as defined below) for the Collateral and the Stalking Horse Agreement shall be treated as a "Qualified Bid" (as defined below) for the Collateral, for all purposes under the sale procedures without having to satisfy the following requirements of this paragraph H, and the following paragraph I.  Only a Potential Bidder that satisfies the following requirements, and which the Receiver and Trustee determine is reasonably likely to be able to consummate a purchase of the Collateral, shall be considered a "Qualified Bidder."  Unless otherwise ordered by the Court, for cause shown, no Potential Bidder for the Collateral will be considered a Qualified Bidder unless prior to or in conjunction with making such bid, the Potential Bidder delivers the following items to the Receiver or CBRE:

        (i)    An executed Confidentiality Agreement (if not previously received by the Receiver);

      (ii) Current audited, or a compilation of, financial statements of the Potential Bidder (to the satisfaction of the Trustee and Receiver), or, if the Potential Bidder is an entity formed for the purpose of acquiring the Collateral, current audited, or a compilation of, financial statements of the equity holder(s) of the Potential Bidder (to the satisfaction of the Trustee and Receiver), or such other forms of financial disclosure reasonably acceptable to the Receiver and Trustee, which information shall demonstrate the financial capability of the Potential Bidder to consummate the purchase of the Collateral should the Potential Bidder be the Successful Bidder; and

      (iii) Cash in the amount of $50,000.00 (the "Good Faith Deposit") to be held in escrow by the title company designated by the Receiver.  (a) The Potential Bidder shall forfeit the Good Faith Deposit if the Potential Bidder is the Successful Bidder and (1) modifies or withdraws the bid without the Receiver and Trustee's consent before the consummation of the sale contemplated by the Marked Contract (defined below), (2) breaches the Marked Contract, or (3) fails or refuses to close timely the sale by the closing date established in the Marked Contract, <u>but only</u> if the Receiver has not materially breached its obligations under the Marked Contract. (b) The Good Faith Deposit shall be promptly returned to the Potential Bidder (1) if the Potential Bidder is not determined to be a Qualified Bidder, (2) if the Potential Bidder is a Qualified Bidder, but is not the Successful Bidder or the Backup Bidder (defined below), (3) if the Potential Bidder is the Successful Bidder (who has not otherwise forfeited its Good Faith Deposit), and the sale is not consummated by the closing date established in the Marked Contract for reasons not attributable to the Potential Bidder, or (4) if the Potential Bidder terminates in accordance with the provisions of the Marked Contract, or (5) if the Potential Bidder is the Backup Bidder and the Successful Bidder consummates the sale in accordance with the applicable Purchase Agreement and pursuant to the procedures set forth in this Sales Procedures

Order; <u>but</u> such Good Faith Deposit shall <u>only</u> be returned <u>if</u> the Potential Bidder has not breached any of its obligations under the applicable executed Purchase Agreement.

    I. Further, any Qualified Bidder that desires to make a bid to purchase the Collateral, and to become an actual bidder (an "Actual Bidder"), shall deliver a copy of its bid as provided below, to CBRE not later than 5:00 p.m., local time, on the third (3rd) business day immediately preceding the first-scheduled date and time of the Auction (the "Initial Overbid Deadline"), subject to paragraph B above.

    J. Each Qualified Bidder's bid for the Collateral must be made upon the terms and conditions substantially similar to those contained in the Stalking Horse Agreement executed by the Stalking Horse Bidder (other than economic terms such as purchase price and liabilities assumed) and must specifically set forth those modifications and amendments to the Stalking Horse Agreement, including, without limitation, price, terms, contracts to be assumed, contracts not to be assumed, liabilities to be assumed, and liabilities not to be assumed, which such Qualified Bidder would propose if it were selected as the Successful Bidder (the "Marked Contract"). All modifications and/or amendments to the Stalking Horse Agreement that are contained in the Marked Contract must be "red lined" against the Stalking Horse Agreement in order to be considered by the Receiver. Further, no bid will be considered unless it conforms with these bidding procedures, including that such bid:

    (i) Provides for a purchase price that exceeds by not less than $75,000.00, the Cash portion of the purchase price to be paid pursuant to the Stalking Horse Agreement, which $75,000 overbid amount shall also be used for the payment of any fees described in paragraph R below;

    (ii) Is not conditioned on the outcome of unperformed due diligence by the Potential Bidder, or the satisfaction of any other condition, that is more burdensome than the

9

Stalking Horse Agreement; provided, however, that due diligence may continue until twenty-four (24) hours before the first-scheduled date and time of the Auction (the "Initial Discovery Deadline"), subject to paragraph B above;

    (iii) Identifies those contracts and leases which the Qualified Bidder wishes to assume and those liabilities which the Qualified Bidder intends to assume; and

    (iv) Is accompanied by (1) a Marked Contract which reflects all modifications and/or amendments to the Stalking Horse Agreement; and (2) a letter affirmatively and unconditionally stating that the Qualified Bidder offers to purchase the Collateral upon the terms and conditions set forth in the Marked Contract, and will forfeit the Good Faith Deposit if the Qualified Bidder becomes either the Successful Bidder (defined below) or Backup Bidder, but fails to close in breach of the applicable executed Purchase Agreement or to abide by the procedures set forth in this Sale Procedures Order.

  K. A bid received from a Qualified Bidder on or before the Initial Overbid Deadline that conforms to the requirements herein, including foregoing Paragraphs, shall constitute a Qualified Bid. Each Qualified Bidder who submits a Qualified Bid shall be an Actual Bidder.

  L. At the commencement of the Auction, the Receiver shall identify the highest and best Qualified Bid (the "HB Qualified Bid"). For purposes of determining which Qualified Bid is the HB Qualified Bid, the Receiver and Trustee shall perform an analysis to determine which Qualified Bid will provide the highest and best net economic benefit. At the Auction, any Actual Bidder may increase its Qualified Bid as provided below, in a writing delivered to the Receiver ("Increased Bid"). Each Actual Bidder in attendance at the Auction shall be advised of any Increased Bids and given a reasonable opportunity to submit another Increased Bid, until such time as no more Increased Bids are forthcoming. When evaluating

Increased Bids, the Receiver shall give the Purchaser credit for the Break-Up Fee (as defined below) provided for herein, which the Purchaser will receive if it is not the Successful Bidder (defined below), for purposes of determining whether the Purchaser's Increased Bid exceeds the last highest Increased Bid. Once the final Increased Bid, if any, is received, the Receiver shall determine which of the HB Qualified Bid or Increased Bids, if any, provides the highest and best net economic benefit, and shall approve such bid (as the "Successful Bid") and such bidder (as the "Successful Bidder"). The Break-Up Fee, if the Purchaser is not the Successful Bidder, shall be paid at closing from the Successful Bidder's Good Faith Deposit and the sale proceeds.

    M.  The Receiver shall also choose the second best Qualified Bid (the "Backup Bid"), if any, which bid shall remain enforceable and shall become the Successful Bid if the Successful Bidder fails to consummate the sale in accordance with the applicable executed Purchase Agreement and the procedures set forth in this Sale Procedures Order. Only upon closure of the sale to the Successful Bidder, the party submitting the Backup Bid (the "Backup Bidder"), is released from its obligation to close on the Backup Bid.

    N.  In connection with setting the date of the Auction, the Receiver shall obtain from the Court a date and time for a hearing to approve entry of the Sale Approval Order (the "Confirmation Hearing"). The day following the conclusion of the Auction, the Receiver shall file with the Court and serve, via email or facsimile, on all parties submitting a bid at the Auction, copies of (i) a report, based on information supplied by CBRE and reflecting the results of the Auction and (ii) a revised proposed form of order approving the sale to the Successful Bidder, modified from <u>Exhibit B</u> to the Sale Procedures Motion to the extent required to provide for the actual sales price and to fill in any other blanks contained in the form (the "Sale Approval Order"). If any such party wishes to object to confirmation of the sale and/or the Sale Approval Order, including the proposed disbursement of the proceeds, they must do so by filing an

objection in writing with the Court setting forth the grounds for the objection, and serving a copy of such objection on counsel for the Receiver and counsel for Trustee, no less than two hours prior to the first scheduled time of the Confirmation Hearing. If a timely objection(s) is filed and served, the Court will hear such objection(s) to determine whether to confirm the sale. If no objections are filed timely and served, the Court shall enter the Sale Approval Order on the date and at the time set for the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time by announcement at the time and place appointed for the Confirmation Hearing, without further notice or order of the Court.

    O. Upon confirmation of a sale to a Successful Bidder, the Receiver shall have the authority to close the sale and execute such deeds, bills of sale, or other instruments as are necessary to convey in the name of Issuer and/or CME-Corners, free and clear of all Encumbrances (except as provided in the applicable Purchase Agreement), all right, title and interest of Issuer and/or CME-Corners in the Collateral to the Successful Bidder upon receipt of the full purchase price. Closing of the sale will occur on the first business day following entry of the Sale Approval Order, unless the Receiver, the Trustee and the prevailing bidder all agree to a later date for Closing.

    P. Unless otherwise ordered by the Court, the Sale proceeds shall be applied as follows:

    (i) First, payment of any amounts borrowed by the Receiver pursuant to Court order;

    (ii) Second, to the Receiver's costs of the Auction and sale and any other fees and expenses of the Receiver related to (a) the operation of the Collateral during the receivership and/or (b) the Auction and sale, including CBRE's commissions and expenses as provided in the Listing Agreement; and

      (iii) Third, the remaining sale proceeds shall be paid over to Trustee to be applied in accordance with its Bond Documents (as defined in the Receiver Order).

    Q. Within three (3) business days of the entry of the Sale Procedures Order, counsel for Trustee shall mail a copy of the Sale Procedures Order to the parties listed in paragraph C(i) above.  In addition, pursuant to the Bond Documents, the Trustee shall transmit by mail notice of the Sale Procedures Order to the bondholders.

    R. In the event the Stalking Horse Bidder is not the Successful Bidder at the Auction because it is outbid by another Qualified Bidder for the Collateral, the Receiver shall pay the Stalking Horse Bidder a fee in an amount equal to two and one-half percent (2.5%) of the Cash, not to exceed Fifty Thousand Dollars ($50,000.00) (the "Break-Up Fee") from the proceeds of the sale of the Collateral following closing of the Sale.  No other Potential Bidders, Qualified Bidders, or Actual Bidders shall be entitled to any such Break-Up Fee.  Furthermore, such Break-Up Fee shall only be paid if the purchase price at the closing of the sale is equal to or greater than the purchase price offered by the Stalking Horse Bidder (subject to the requirements of paragraph J(i) above with respect to any initial topping bid over the purchase price provided for in the Stalking Horse Agreement), accepted by the Receiver at the Auction (the "Accepted Price"), and such party overbidding the Stalking Horse Bidder pays in cash the Accepted Price to the Receiver, without reservation or claim.

IT IS FURTHER ORDERED that the provisions of this Order are non-severable and mutually dependant, and the terms of this Order and any applicable Purchase Agreement shall be binding upon CME-Corners, the Receiver, their creditors, parties with any claims against CME-Corners and the Collateral, and other parties in interest, and any successors of such parties. SIGNED this 1st day of September, 2006.

                                              /s/ Jon P. McCalla
                                              Jon Phipps McCalla
                                              United States District Court Judge

Submitted for Entry:


/s/ Timothy G. Niarhos
Samuel K. Crocker  (BPR #6094)
Timothy G. Niarhos (BPR #14428)
CROCKER & NIARHOS
Suite 2720, Renaissance Tower
611 Commerce Street
Nashville, TN  37203
615-726-3322 – Telephone
615-726-6330 – Facsimile
skctrustee@aol.com/tim@skctrustee.com

*Attorneys for the Receiver*